# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 06-852


**STATE OF LOUISIANA**

**VERSUS**

**JOSEPH "JODY" DUPLICHAN, JR.**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR05-3814
HONORABLE JOEL GERARD DAVIS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***


**BILLY HOWARD EZELL**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Billy Howard Ezell, Judges.


**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**


**Sherry Watters**
**Louisiana Appellate Project**
**P. O. Box 58769**
**New Orleans, LA 70158-8769**
**(504) 723-0284**
**Counsel for Defendant/Appellant:**
**Joseph "Jody" Duplichan, Jr.**

**Douglas L. Hebert, Jr.**
**District Attorney, Thirty-Third Judicial District Court**
**Sherron Ashworth**
**Assistant District Attorney, Thirty-Third Judicial District Court**
**P. O. Drawer 839**
**Oberlin, LA 70655**
**(337) 639-2641**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**EZELL, JUDGE.**

On November 3, 2005, the State filed an indictment charging Defendant, Joseph "Jody" Duplichan, Jr., with two counts of indecent behavior with a juvenile, in violation of La.R.S. 14:81. One count involved a juvenile victim born in 1993, and the other involved a victim born in 1991. Pursuant to a State motion, the trial court held a *Prieur* hearing on February 14, 2006; it granted the motion in part and denied it in part.

The jury was selected on February 21, 2006; on February 22, it found Defendant guilty as charged on both counts. Defendant filed a motion for new trial, which the court denied on April 18. The court conducted a sentencing hearing on April 26 and sentenced Defendant to seven years at hard labor on each count. The sentences are to run consecutively with one another and with Defendant's sentence from a prior conviction.

Defendant now appeals his convictions and sentences, assigning three errors.

## FACTS

In late September of 2005, Defendant was staying at the home of his niece, Rebecca Fontenot, due to the after-effects of Hurricane Rita. Other relatives were also staying at the residence because Mrs. Fontenot and her husband had a generator. The Fontenots had three daughters: sixteen-year-old Monica, fourteen-year-old M.S., and nine-year-old E.C. Mrs. Fontenot's sister, Melissa Gauthreaux, and her twelve-year-old daughter, A.P., were also among those staying at the residence.[1]

On September 28, 2005, people had gathered at the Fontenot home, and many of the adults were drinking alcoholic beverages. Gradually, various individuals left

---

[1]The juvenile victims and some relatives are identified by their initials, pursuant to La.R.S. 46:1844(W). The victim M.S.'s sister, Monica, is referred to by her first name, to avoid confusion between the two girls. Defendant differentiates between the two by using triple sets of initials, but the record source for each girl's middle initial is not clear.

the gathering to go to sleep. Most of the girls went to bed by approximately 10:00 p.m., but Monica did not go to bed until after midnight. Shortly before 11:00 p.m., Defendant's sister, D.S. (the victims' grandmother), went inside the house to go to sleep; before going to bed, she took some Benadryl.

When twelve-year-old victim A.P. entered the house, D.S. was already asleep on a mattress in the living room. Monica testified that she went to bed at about 2:00 a.m. and that D.S., A.P., M.S., and E.C. were all in bed by then. Fourteen-year-old victim M.S. testified that she went to bed between 10:00 p.m. and 10:30 p.m.

A.P. was sleeping near her grandmother, D.S., and lying face-down. She woke up because someone was rubbing her back. Initially, she thought it was her mother, but she realized it was Defendant. He also began rubbing her buttocks underneath her clothes, and he tried to put his hands in her shirt. After she told him to stop "about five times," he finally did. Defendant then left the room, and A.P. hid behind a recliner.

Monica testified that before she had fallen completely asleep, she noticed her bedroom door had been opened. She saw a male figure and thought it was her grandfather; however, Defendant spoke to her and she recognized his voice. He left and shut the door behind him.

According to M.S.'s testimony, she was asleep face-down in her bedroom but began to awaken to the sensation of someone rubbing her back. He then starting rubbing her buttocks inside her pants but over her underwear. She woke up fully when she felt him move his hands inside her underwear and "towards the front," toward her "private area." She told him to stop, and he got up and left the room. Very soon after he left, A.P. came into the room, crying, and each told the other what had happened. A.P. testified that when she saw Defendant reenter the living room

2

area, she went to M.S.'s room. According to both the girls' testimonies, they believed Defendant was still inside the residence, so they climbed out of a window and told Mrs. Fontenot what had happened. Mrs. Fontenot testified there were only two doors leading out of the house. A diagram admitted pursuant to her testimony shows that both doors lead out of the family room, on the other side of the house from where the girls were.

The family contacted police, who arrested Defendant.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there are two errors patent.

First, the trial court imposed indeterminate sentences. The Defendant was convicted of two counts of indecent behavior with a juvenile. The penalty provision for that offense provides for the sentence to be imposed with or without hard labor. La.R.S. 14:81(C). The trial court in the present case imposed a sentence of seven years on each count without specifying whether the sentences were to be served with or without hard labor. Thus, the sentences imposed by the trial court are indeterminate and should be vacated. The case should be remanded for resentencing and the trial court instructed to specify whether the sentences are to be served with or without hard labor. *See State v. Loyden*, 04-1558 (La.App. 3 Cir. 4/6/05), 899 So.2d 166.

Additionally, we note that the trial court failed to deny the Defendant eligibility for diminution of sentence. Lousiana Revised Statutes 15:537(A) requires diminution of sentence be denied to a person who is convicted of or pleads guilty to a sex offense, including indecent behavior with a juvenile. Recently, this court addressed

3

this issue in *State v. S.D.G.*, 06-174, pp. 4-5 (La.App. 3 Cir. 5/31/06), 931 So.2d 1244, 1247:

> Louisiana Revised Statutes 15:537(A) requires that diminution of sentence be denied to all offenders who are convicted of or plead guilty to sex offenses, including aggravated rape and aggravated incest. Here, the trial court failed to deny the defendant diminution eligibility under La.R.S. 15:537(A) for both sentences imposed. In *State v. G.M.W., Jr.*, 05-391, p. 2 (La.App. 3 Cir. 11/2/05), 916 So.2d 460, 461, the court stated:
>
>> We note that the second paragraph of La.R.S. 15:537 is clearly directed to the sentencing court, and the trial court's failure to include a denial of diminution of sentence thereunder renders Defendant's sentences illegally lenient. Pursuant to *State v. Williams*, 00-1725 (La.11/28/01), 800 So.2d 790 and La.Code Crim.P. art. 882, this court is authorized to recognize and correct illegally lenient sentences.
>
> Here, the trial court's failure to deny diminution of sentence renders the defendant's sentences illegally lenient. Therefore, we amend the defendant's sentences to reflect that diminution eligibility is denied pursuant to La.R.S. 15:537(A). We also instruct the trial court to make a notation in the minutes reflecting the amendment.

Accordingly, upon remand for resentencing, the trial court is instructed to deny the Defendant eligibility for diminution of sentence on both counts of indecent behavior with a juvenile.

### ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant argues the evidence against him at trial was insufficient to support the conviction. The analysis of such a claim is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the

4

respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

On appeal, Defendant argues the verdicts of indecent behavior with juveniles should be vacated, and the verdicts of *attempted* indecent behavior with juveniles entered. The elements of indecent behavior with juveniles are set forth in La.R.S. 14:81(A), which states:

> Indecent behavior with juveniles is the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. Lack of knowledge of the child's age shall not be a defense.

Defendant argues the State failed to prove that Defendant completed any acts to arouse or gratify sexual desire. In support of this assertion, Defendant states:

> In the light most favorable to the prosecution, the State's evidence did not show that the acts to arouse or gratify sexual desire were completed. The responsive verdicts of attempted indecent behavior are required.

> A.P. said that Jody rubbed her back up and down, but did not attempt to go lower than her butt. She emphatically said he did not try to touch her private area. M.S. said that she slept through a back rub and the touching of her butt, and only woke when Jody's hand was at the side of her hip.

In regard to A.P., we note the relevant colloquy in full:

Q    You were woken up at some point during that night?

A    Yes, sir.

Q    Tell the jury why you were waken up?

A    Because somebody was rubbing my back. At first, I thought that it was my mom.

5

Q    How were they rubbing your back?

A    What do you mean?

Q    Did they just rub it one time or was it in a circular motion or how was it?

A    Like just up and down my back.

Q    How many times do you think they did that up and down your back?

A    I really don't know.

Q    Okay.  So at first you thought that it was your mother?

A    Yes, sir.

Q    Okay.  And did you find out who it was actually touching you?

A    Yes, sir.

Q    And how did you find out who it was that was actually touching you?

A    I woke up.

Q    Okay.  And what happened when you woke up?

A    I turned over to see who it was.  It was Jody.

Q    Did he only touch you on your back.

A    No, sir.

Q    Where else did he touch you?

A    On my back side.

Q    On your back side?  Are you talking about your buttocks?  Your butt area.

A    Yes, sir.

Q    Did he touch you there on top of your clothes or underneath your clothes?

A    Underneath.

Q    How did he touch you on your butt area?

6

Q      What do you mean?

A      Yes, sir.

Q      Did he rub your butt?

A      Yes, sir.

Q      Did you ask him to stop?

A      Yes, sir.

Q      At any point did he try to touch you any other way?  Did he try to put his hand on your leg or anything like that?

A      He tried to put his hand in my shirt.

Q      He tried to put - Say that again.  I'm sorry.

A      He tried to put his hand down my shirt.

Q      Did he try to put his hands up your pants leg or anything like that?

A      No, sir.

Q      When you told him to stop, did he?

A      No, sir.

Q      He kept doing it more?

A      Yes, sir.

Q      What caused him eventually to stop?

A      I told him to stop.  After about five times, he finally did.

We find A.P.'s testimony showed Defendant's acts of rubbing the young girl's back and buttocks were completed acts.  In the context of the situation, it is clear Defendant rubbed the girl for his own sexual arousal.  Although he apparently did not complete the act of reaching inside her shirt, his attempt to do so further supports that his other, completed acts were sexual in nature.

In regard to M.S., we note the relevant passages from the transcript:

Q      Okay. Did you sleep all of the way until the next morning in your bedroom or not?

7

A    No, sir.

Q    What happened?

A    I woke up when I felt like somebody moving towards the front of my pants.

Q    Did you become aware of who that was touching you?

A    Not until I woke up like when he was moving his hands towards the front.  That's whenever I woke up.

Q    Okay.  And when you say he was moving his hands towards the front, what are you talking about?

A    Like toward my private area.

Q    Was the hand inside or outside our underwear?

A    Inside.

Q    This was on your bare skin?

A    Yes, sir.

Q    Did anybody rub your back before this happened?

A    Yes, sir.

Q    Tell me, if you wouldn't mind, the sequence of what happened as far as you recall.  Someone rubbed your back?

A    Yes, sir.  And he started rubbing my bottom, like in my pants, but it was on top of my underwear.  Then he put his hands in my pants and he started moving towards the front.  And that's when I woke up and I told him to stop.

Q    Okay.  At what point did you say that you were aware that it was Jody Duplichan that was doing this to you?

A    When like he was moving his hands toward the front.

Q    Did you tell him to stop?

A    Yes, sir.

Q    Did he stop?

A    Yes, sir.

8

Q       Was he loud when he was doing this or was he quite [sic] or how would you describe him?

A       He was quite [sic].

Again, the testimony demonstrates Defendant rubbed a girl's buttocks in a context of sexual advances. Since he physically touched both girls, it is clear the acts were completed. Thus, Defendant's argument lacks merit as to both victims, and the convictions are affirmed.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant argues he received ineffective assistance of counsel. In *State v. James*, 95-962, pp. 4-5 (La.App. 3 Cir. 2/14/96), 670 So.2d 461, 465, this court explained:

> In order to prove that counsel was ineffective, the defendant must meet the two-pronged test enunciated by the Supreme Court. First, the defendant must show that counsel's performance was deficient. Second, the defendant must show that this deficiency prejudiced the outcome of the trial. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Brooks*, 505 So.2d 714 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).

Also, this court often defers such claims to the post-conviction process, so the record can be developed in regard to the issue at hand. However, this court will address ineffective assistance claims on appeal, when the record is sufficient to analyze the claim. *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62.

Defendant argues counsel was ineffective in three major areas:

> 1)    She failed to file a motion to suppress Defendant's pre-trial invocation of his right to remain silent and failed to object when it was referred to at trial.

> 2)    She failed to challenge the use of family member Melissa Gautreaux's testimony, regarding a prior bad act that Defendant allegedly committed against her and did not ask for special jury instructions on the matter, at trial.

9

3) She failed to file a motion to reconsider sentence. [We find this part of the assignment is moot, due to the error patent regarding the sentences.]

Regarding the reference to Defendant's invocation of his right to silence, we note the relevant colloquy:

Q     Did you attempt to take a statement from Mr. Duplichan?

A     Not at that time.  Not at the residence.

Q     Let me ask you, at the residence, were you able to talk with Mr. Duplichan and observe Mr. Duplichan?

A     Yes, sir, I observed him.

Q     Was he able to stand on his own free will?

A     He was in a unit.

Q     You said that you didn't ask him any questions at that time, correct?

A     No, sir.

Q     When did you ask him questions?

A     When we got to the Kinder PD.

Q     Was - When you would ask him questions, would he give appropriate responses indicating that he understood what you were saying to him?

A     Yes, sir.

Q     And could you please describe his state?  How did he seem to you?

A     Mr. Duplichan, you could smell an alcoholic beverage coming from him, but you know, he was in pretty good standing.  When I asked questions, he would answer with no problem.

Q     And did he make any kind of statement in conjunction with any kind of statement that you were trying to obtain from him?

A     At the PD?

Q     Yes, sir.

A     Yes.

Q     What did he say?

A     One of the things that he said, after he sat there a while and I read his Miranda Warning rights to him, he stated that he could be backing twenty years if he would say anything.

Q     So at that time, he invoked his Miranda Rights and didn't say anything?

A     Right.

MR. GREEN:

        May I approach, Your Honor?

THE COURT:

        Yes, you may.

Q     Detective Courville, I'm going to show you what has been marked as State-7. Would you look at that? (The witness complies.) Do you recognize that, sir?

A     Yes, sir.

Q     And what is that?

A     This is a Miranda Warning so that people will know what their rights are.

Q     Okay. And do you go over that form with the defendant or how does that form work in conjunction with an investigation?

A     We go over it with them and we read it to them and make sure that they understand it.

Q     Okay. And was that form gone over by an officer to the defendant?

A     Yes, sir, it was.

Q     And which officer went over that form with the defendant?

A     It was myself.

Q     Okay. Did Mr. Duplichan indicate whether or not he understood what his rights were?

11

A He just basically stated that he wasn't saying nothing.

Q Okay. And did he sign anything on that form?

A No, sir.

Q Did he indicate to you that he understood what he was doing when he was invoking his rights?

A Yes, sir.

While Defendant's argument is couched as an argument that trial counsel should have protected him from the State's reference to his post-arrest *silence*, the true thrust of his argument is counsel should have contested the State's use of his post-arrest *statement*.

The State's brief acknowledges that Defendant invoked his right to remain silent after being Mirandized, but argues "[a]ll statements up to and including this statement were admissible as this statement was made freely and voluntarily and prior to [Defendant] invoking his rights."

We find the colloquy cited above shows Defendant made the contested statement contemporaneously with his invocation of his right to remain silent. Thus, we find the State's reference to Defendant's remark would pose no constitutional violation, since it is well-settled that the right to remain silent may be waived.

It is also well-established that *even after* a Defendant has invoked his right to silence, it may be waived later, without offending constitutional protections. The supreme court has explained:

> When a defendant exercises his privilege against self-incrimination the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to remain silent. *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Whether police have "scrupulously honored" an accused's right to silence is determined on a case-by-case basis under the totality of the circumstances. *Id.*; *State v. Brooks*, 505 So.2d 714, 722 (La.1987); *State v. Harper*, 430 So.2d 627, 633 (La.1983); *State v. Thucos*, 390 So.2d 1281, 1285 (La.1980); *State v. Manning*, 380 So.2d 46, 50 (La.1980).

Factors going into the assessment include who initiates further questioning, although, significantly, police are not barred from reinitiating contact, *Mosley*, 423 U.S. at 103-104, 96 S.Ct. 321; *cf. Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (invocation of right to counsel during custodial interrogation has greater protection than invocation of right to remain silent, as police may not thereafter question defendant unless he initiates further contact); whether there has been a substantial time delay between the original request and subsequent interrogation; whether *Miranda* warnings are given before subsequent questioning; whether signed *Miranda* waivers are obtained; and, whether the later interrogation is directed at a crime that had not been the subject of the earlier questioning. *Michigan v. Mosley*, 423 U.S. at 105, 96 S.Ct. 321; *Brooks*, 505 So.2d at 722; *Harper*, 430 So.2d at 633.

*State v. Taylor*, 01-1638, pp. 6-7 (La. 1/14/03), 838 So.2d 729, 739, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036 (2004).

Clearly, the analysis discussed in *Taylor* would not apply in the present case because the remark at issue was contemporaneous with, rather than subsequent to, Defendant's assertion of his right to remain silent. We find the Defendant's statement was a spontaneous utterance. Such utterances have been held admissible in various contexts involving *Miranda* and constitutional protections. For example, we note a recent analysis by this court:

At the hearing on the motion to suppress, Detective Roberts testified that she informed the defendant of his rights and the defendant indicated he had nothing to say to her. No waiver of rights form was presented to the defendant. However, Detective Roberts indicated the defendant understood his rights. Detective Roberts later told the defendant what he was being charged with in Louisiana and explained the extradition process. During that time, the defendant told Detective Roberts, "I took that truck, but I didn't use a weapon. I don't know where they got that from, but I didn't have a weapon."

Detective Roberts testified that the defendant appeared upset and looked tired. However, no threats, promises, or force was used to obtain a statement from him.

The defendant testified that between November 11 and 12, he had used a little more than an ounce of crack cocaine, three ecstasy pills, and five zanbars and drank "better than" a fifth of Jack Daniels or Evan Williams. When he was questioned by Detective Roberts, he said he was "dead to the world" and only understood "something about an

13

extradition process." He had no recollection of Detective Roberts reading his rights and testified that he did not knowingly waive his rights. The defendant further testified that he clearly recalled telling Detective Roberts that he did not want to make a statement.

In ruling that the statement made to Detective Roberts was admissible, the trial court stated the following:

> As she began to inform him of the process for extradition, he volunteered the following statement, that he did not use a – that he took the truck but did not use a weapon.
>
> There was – Mr. Pitre then gave testimony to the effect that he, in fact, decided not to give a statement and denied making a statement. There's no question that Mr. Pitre was aware of his rights and exercised those rights with Ms. Roberts not to give a statement, at which time she ceased her interview about the substantive nature of the offense.
>
> The fact that *he volunteered this information* to her as she was advising him about the extradition procedure does not render that an involuntary statement, and, therefore, the Court rules that the statement made to Detective Lori Roberts of the Houston Police Department will be admissible.

The defendant may have invoked his right to remain silent; however, Detective Roberts did not violate that right by informing the defendant of what he would be charged with in Louisiana and the extradition process. The defendant waived his right to remain silent when he *spontaneously blurted out* the inculpatory statement. *See State v. Williams*, 99-2355 (La.App. 4 Cir. 12/13/00), 776 So.2d 604, *writ denied*, 01-1829 (La.4/12/02), 812 So.2d 667. Additionally, Detective Roberts never testified that the defendant was nodding out or that he was incoherent. She did, however, testify that he was tired. Accordingly, the trial court applied the appropriate standard and its ruling is correct.

*State v. Pitre*, 05-405, pp. 4-5 (La.App. 3 Cir. 3/1/06), 924 So.2d 1176, 1180-81.

(emphasis added).

We also note an analysis by the second circuit:

> Defendant asserts that the trial court erred in allowing the state to introduce his statement. Once arrested, defendant requested an attorney. The arresting officers took him to the detective office. While waiting in the office, defendant made a *gratuitous* statement implicating himself as the perpetrator of the attempted armed robbery. Defendant admits that

14

the statement was not made in response to interrogation, but claims that if he had not been put in such a position, he would never had made the statement.

Once an individual in custody expresses a desire for an attorney, at any stage in the process, further interrogation must cease until an attorney has been made available to him, unless the suspect initiates further communication, exchanges or conversation with the police. *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *State v. Tilley*, 99-0569 (La.07/06/00), 767 So.2d 6, *cert. denied*, 532 U.S. 959, 121 S.Ct. 1488, 149 L.Ed.2d 375 (2001); *State v. Koon*, 96-1208 (La.05/20/97), 704 So.2d 756, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). *Police are not obligated to ignore spontaneous and unsolicited statements by someone in custody*, as long as those statements do not result from police-initiated custodial interrogation or questioning "reasonably likely to elicit an incriminating response." *State v. Tilley, supra*; *State v. Ross*, 95-1798 (La.03/08/96), 669 So.2d 384, *appeal after remand*, 98-0283 (La.App. 4th Cir.09/08/99), 743 So.3d 757. Nor does a previous assertion of the right to counsel bar admission of such statements. *Id*.

In this case, there was no behavior by police officers that constituted direct questioning, nor were there circumstances that approached the functional equivalent of interrogation. Defendant admitted that his incriminating remarks were made before interrogation actually took place and were made *gratuitously*, not in response to a question by Officer Grant. There is no merit to defendant's argument that the statement should be suppressed simply because he was first taken to a detective's office rather than being taken directly to the booking area. There is no evidence that defendant was held in the detective's office for an undue or excessive amount of time, nor is there evidence that he was coerced or pressured in any way to make his statement. Officer Grant had not engaged defendant in conversation at the time the statement was made, nor did he ask defendant any questions after he asserted his right to counsel. We therefore find no abuse of the trial court's discretion in its denial of the motion to suppress defendant's inculpatory statement.

*State v. Williams*, 36,456. pp. 5-6 (La.App. 2 Cir. 10/4/02), 827 So.2d 1286, 1289-90,

*writ denied*, 02-3071 (La. 9/19/03), 853 So.2d 633 (emphasis added).

While neither of the two cases just cited is on all fours with the present one,

they show jurisprudential support for the conclusion that, in the instant case,

Defendant's spontaneous statement was admissible. Thus, even if his trial counsel's

performance was deficient pursuant to *Strickland*, it did not prejudice his case. Thus, his first argument under this assignment lacks merit.

Defendant's second argument under this assignment is that trial counsel failed to challenge Melissa Gautreaux's testimony regarding a prior bad act that Defendant allegedly committed against her and did not ask for special jury instructions on the issue.

As the State points out, Defendant's trial counsel did contest the admissibility of Gautreaux's testimony, albeit unsuccessfully, in a *Prieur* hearing held on February 14, 2006.[2] Further, we note that a *Prieur* hearing is not required for evidence admitted pursuant to La.Code Evid. art. 412.2. *State v. Williams*, 02-1030, 02-898 (La. 10/15/02), 830 So.2d 984. Thus, Defendant's argument that counsel failed to contest the "other crimes" evidence pre-trial lacks merit. However, the State does not address Defendant's complaint that counsel failed to request a special jury instruction regarding Gautreaux's testimony. Our review of the record does not show any request for a special jury instruction at the *Prieur* hearing or at trial. Further, the court gave no such instruction, although it did give a requested instruction regarding intoxication.

In applying the two-part *Strickland* analysis previously discussed, the issue of whether counsel's performance was deficient is not easily determined. Pursuant to La.Code Evid. art. 105 and *State v. Brown*, 03-1747, (La. App. 3 Cir. 5/12/04), 874 So.2d 318, *writ denied*, 04-1413 (La. 11/8/04), 885 So.2d 1118, the trial court would have been required to give an instruction limiting the other crimes evidence to its proper scope. In the absence of such a request, failure to make such an instruction

---

[2]The trial court did exclude evidence regarding Defendant's prior act of raping an elderly woman.

16

does not constitute reversible error. La.Code Evid. art. 105. Thus, counsel failed to obtain a limiting instruction and also failed to preserve the issue for appeal.

Since trial counsel did seek and obtain a special instruction regarding intoxication, it is possible that counsel made a strategic decision to concentrate on the intoxication issue and thus elected not to seek any other special instructions. When reviewing matters of trial strategy, this court has noted:

> This Court has recognized that if an alleged error falls "within the ambit of trial strategy" it does not "establish ineffective assistance of counsel." *State v. Bienemy*, 483 So.2d 1105 (La.App. 4 Cir.1986). Moreover, as "opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful." *State v. Brooks*, 505 So.2d 714, 724 (La.1987).

*State v. Schexnaider*, 03-144, p. 18 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 462 *(quoting State v. Griffin*, 02-1703, pp. 9-10 (La.App. 4 Cir. 1/15/03), 838 So.2d 34, 40, *writ denied*, 03-809 (La. 11/7/03), 857 So.2d 515).

On the other hand, this court will recognize deficient performance on appeal. *See, e.g., State v. Roberson*, 05-1206 (La.App. 3 Cir. 3/1/06), 924 So.2d 1201. (Defense counsel failed to contest inadmissible evidence). The court suggests it is questionable whether foregoing an instruction on other crimes evidence would ever be a viable trial strategy, given the potential prejudice attendant with other crimes evidence. Thus, the court determines counsel's performance was deficient.

Since the court has determined trial counsel's performance was deficient, pursuant to *Strickland*, we will discuss whether said performance prejudiced Defendant such that counsel was constitutionally ineffective. Counsel's errors can be held non-prejudicial for *Strickland* purposes when the State has presented a strong case, much as in a standard harmless error review. *See, e.g., State v. Busby,* 94-1354

17

(La.App. 3 Cir. 4/5/95), 653 So.2d 140, *writ denied*, 95-1157 (La. 9/29/95), 660

So.2d 854.

As the *Busby* court discussed:

> In his first argument, the defendant contends his trial attorney was ineffective because he failed to move for a mistrial when the prosecutor dismissed one of the counts against the defendant. The state's entire case had been presented, so the defendant reasons that the evidence already adduced as to the dismissed count was "other crimes" evidence which prejudiced the jury's consideration of the remaining counts.
>
> . . . .
>
> [E]ven if the defendant in that case had been prejudiced by the dismissal, the error was harmless beyond a reasonable doubt, because the state had presented sufficient evidence to prove each of the other counts. Thus, each of the remaining counts was able to stand on its own, without evidence from the dismissed count. Adopting this reasoning, the record suggests that any error in this case is also harmless.
>
> As the defendant has neither raised nor briefed insufficiency of the evidence as an error, we will not conduct a full-blown review. However, some analysis is required to assess possible prejudice to the defendant.
>
> . . . .
>
> The state's case as to count one and count two was supported by the testimony of the two young victims, who graphically described the defendant's actions, e.g., one victim's testimony clearly described forced fellatio. Their testimony, in turn, was supported by evidence adduced from the examining physician and the investigating officers. Sufficient evidence was presented to prove the elements of the charged crimes beyond a reasonable doubt. . . . [A]any prejudice resulting from the dismissal of count three was harmless beyond a reasonable doubt. Since defendant was not entitled to a mistrial, his attorney was not ineffective in failing to move for a mistrial.

*Id.* at 144-46 (citations omitted).

Thus, the court's ultimate decision on this assignment of error hinges on its view of the strength of the State's case. As discussed earlier, in the court's review of the sufficiency of the evidence, the State adduced testimony from both victims. Each girl identified Defendant as her assailant and described his actions, which were of a

18

type intended to arouse or gratify his sexual desires, as proscribed by La.R.S. 14:81.

Also, the State presented testimony from Rebecca Fontenot, who testified that after

the girls had entered the house to go to bed, she noticed Defendant missing from the

group of adults:

> Q At any point in time while you were out there with those individuals did you see Jody Duplichan leave that company or that crowd out there?
>
> A Yes, I did. Earlier that evening we had pretty much all took turns going and jumping into my pool and cooling off because it was humid from the hurricane. And when I did see him get up, I didn't really pay attention to how long he was gone, but I did notice that some time had passed. I made the comment to my sister, "I hope he's not floating in my pool." It was a joking comment.
>
> Q Now where would your pool be in connection with this house? Where would the pool be located?
>
> A The square around the patio.
>
> Q Right.
>
> A It's right behind the patio, inside that square.
>
> Q All right. So you thought that he had gone to the pool and you testified that he had gone from some time?
>
> A I'd say at least twenty minutes.
>
> Q At least twenty minutes? What happened after you noticed that he was gone?
>
> A Well, I made that comment to my sister. Maybe about five minutes later, I said, "I'd better get up and go and check because he might really be floating the pool." A few minutes after that, that's when the girls come outside.
>
> Q Okay. When you say that the girls came outside, what girls are we talking about?
>
> A My niece, [A.P.], and my daughter, [M.S.].

Melissa Gathreaux testified similarly.

The Defendant suggests that the State's time table was unclear and that there were inconsistencies in the two girls stories. However, all of this testimony was presented to the jury.

The court finds the victims' testimonies were very credible, and therefore, counsel's failure to request special instructions did not prejudice Defendant's case for purposes of *Strickland*. For this reason Defendant's argument lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

This assignment, which attacks Defendant's sentence, is moot because of the errors patent already discussed.

## CONCLUSION

Defendant's convictions are affirmed; however, his sentences are vacated as indeterminate, and the case is remanded for resentencing. The trial court is instructed to specify whether the sentences imposed are to be served with or without hard labor. Additionally, this court will instruct the trial court to deny the Defendant eligibility for diminution of sentence on both counts of indecent behavior with a juvenile.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING WITH INSTRUCTIONS.**

20