# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 15-1008


STATE OF LOUISIANA

VERSUS

ADAM BATISTE, III


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR-141203
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

**ELIZABETH A. PICKETT**
**JUDGE**

**********

Court composed of Marc T. Amy, Elizabeth A. Pickett, and James T. Genovese, Judges.


**AFFIRMED.**


**Keith A. Stutes**
**District Attorney, Fifteenth Judicial District**
**Cynthia K. Simon**
**Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O.Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT- APPELLANT:**
**Adam Batiste, III**

**Adam Batiste, III**
**Hickory #1**
**Louisiana State Penitentiary**
**Angola, LA 70712**
**Pro Se**

**PICKETT, Judge.**

## FACTS

On January 16, 2013, the defendant Adam Batiste, III called 911 and requested help for his girlfriend, Gabriella Spencer, stating that she had fallen in the shower, was not responsive, and was barely breathing. When the fire department arrived, they saw that Ms. Spencer appeared to have been severely beaten and summoned the police. Ms. Spencer was taken to the hospital where it was determined she also suffered from a subdural hematoma which caused her death shortly thereafter. The defendant was subsequently arrested for the second degree murder of Ms. Spencer.

The defendant was indicted on March 22, 2013, for the second degree murder of Gabriella Spencer, a violation of La.R.S. 14:30.1. A jury trial commenced on April 29, 2015. On May 1, 2015, the jury returned a verdict of guilty as charged.

The defendant was sentenced on May 6, 2015, to life imprisonment without the benefit of parole, probation, or suspension of sentence. The defendant did not file a motion to reconsider the sentence.

The defendant has perfected a timely appeal. He asserts that "[t]he State failed to offer sufficient evidence that Adam Batiste committed second degree murder and did not negate the reasonable probability that the fatal injury was accidentally self-inflicted." The defendant has also filed a pro-se brief, which alleges insufficient evidence and ineffective assistance of trial counsel.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

**ATTORNEY ASSIGNMENT OF ERROR NUMBER ONE, AND PRO SE ASSIGNMENT OF ERROR NUMBER ONE:**

The defendant argues the state failed to negate the reasonable hypothesis that Ms. Spencer's injuries were accidently self-inflicted when she fell in the shower. Alternatively, he suggests her injuries were caused by some unknown persons who beat her up on December 28, 2012, and possibly caused the head injury at the same time. Since there was no eyewitness to what caused any of Ms. Spencer's injuries, and the defendant did not confess to causing her injuries, the verdict was based solely on circumstantial evidence. The circumstantial evidence rule states that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438. The defendant asserts that with only the circumstantial evidence, the state failed to prove he caused the victim's death; accordingly, the evidence was insufficient to sustain the verdict.

This court has stated that questions of the sufficiency of the evidence are considered using the following standard of review:

> [A] reviewing court must consider the evidence presented in the light most favorable to the prosecution and consider whether a rational trier of fact could have concluded that the essential elements of the offense were proven beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court defers to rational credibility and evidentiary determinations of the trier of fact. *State v. Marcantel*, 00-1629 (La.4/3/02), 815 So.2d 50.

*State v. Chesson*, 03-606, p. 5 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 172, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686.

Additionally, in *State v. Williams*, 13-497, pp. 4-5 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, 1240, *writ denied,* 13-2774 (La. 5/16/14), 139 So.3d 1024, this court noted:

2

"Evidence may be either direct or circumstantial." *State v. Jacobs*, 07-887, p. 12 (La.App. 5 Cir. 5/24/11), 67 So.3d 535, 551, *writ denied*, 11-1753 (La.2/10/12), 80 So.3d 468, *cert. denied*, ___ U.S. ___, 133 S.Ct. 139, 184 L.Ed.2d 67 (2012). We note that, whether the conviction is based on direct evidence or solely on circumstantial evidence, the review is the same under the *Jackson v. Virginia* standard. *State v. Williams*, 33,881 (La.App. 2 Cir. 9/27/00), 768 So.2d 728 (citing *State v. Sutton*, 436 So.2d 471 (La.1983)), *writ denied*, 00-99 (La.10/5/01), 798 So.2d 963. Circumstantial evidence is that where the main fact can be inferred, using reason and common experience, from proof of collateral facts and circumstances. *Id.* Where the conviction is based on circumstantial evidence, in order to convict, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La.R.S. 15:438.

In *State v. Chism,* 436 So.2d 464, 469 (La.1983) (citations omitted), the supreme court discussed the use of circumstantial evidence, stating:

> Circumstantial evidence involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion.

> Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of

preliminary facts excludes every reasonable hypothesis of innocence.

In the current case, the defendant was convicted of second degree murder, which is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). At trial, the following testimonies and exhibits were presented:

On January 16, 2013, Robert Davis, a firefighter with the Lafayette Fire Department, responded to a 911 call regarding a woman who was having breathing difficulties. He was the first responder on the scene. He testified that as he was walking up to the house, the defendant met him at the door with Ms. Spencer slung over his shoulder. Mr. Davis directed the defendant back into the house. Ms. Spencer was laid on the floor at the bottom of the upstairs steps. She was wearing only a shirt. The defendant went upstairs and was not seen again until the ambulance and the police arrived. Mr. Davis did not recall if the victim or her shirt were wet. He testified that her pulse was very weak, and her eyes were opened but crossed. While he was attending to her, she went into cardiac arrest. Because he had to cut off her shirt and the defendant had not yet come back down stairs, Mr. Davis went into the laundry room to look for something to clothe her with. Mr. Davis said there were towels and rags tossed around, and the laundry room smelled strongly of bleach. He further stated that the police were called because of Ms. Spencer's condition. She was bruised and scratched over much of her body. Mr. Davis went in the ambulance with Ms. Spencer to the hospital to help continue with chest compressions.

Ben Smith, a corporal with the Lafayette Police Department, was the first officer to respond. He testified that the defendant told him that Ms. Spencer had not been feeling well and that she had not been eating or drinking and had been

vomiting a lot. That morning, as she was showering, he heard a crash, and when he went into the bathroom, she was lying face down in the tub. The defendant took her out of the bathtub and sat her on the toilet seat. He said he tried to revive her, but she remained unresponsive. After about twenty minutes, the defendant called 911 for help. The defendant also told Corporal Smith that Ms. Spencer had been involved in an altercation with a bus driver on December 28, 2012. Corporal Smith also learned that a friend of the defendant's, Rodney Joubert, had been staying at the defendant's house for three or four days.

Detective Scott Broussard, a crime scene investigator with the Lafayette Police Department, testified that because of the small cuts on the victim's body, he looked for evidence of blood around the house. The detective described a chemical called Blue Star, which was a blood reagent that reacted with the hemoglobin in the blood. He stated he sprayed the reagent around the house and in the defendant's and Ms. Spencer's bedroom and bathroom. He said there was a reaction to the chemical in the bathroom and on the bed. The detective also explained that when blood was cleaned up using Clorox, the area where the chemical was sprayed will turn a brilliant blue and then rapidly fade to a quieter shade of blue. He stated this happened in the bathroom and bedroom. The detective took photographs of the areas showing the blue luminescence. The detective also swabbed the spots with a hemastick to test the spots for possible blood. The swabs were sent to Acadiana Criminalistic Laboratory for analysis. The detective admitted there was no way to know when the blood was deposited or whose blood it was. He explained that Clorox destroyed DNA. He further explained the field testing procedure was only a presumptive test for blood.

Paul Trouard, a detective with the Lafayette Police Department, was the lead investigator in this case. Ms. Spencer had been removed to the hospital by the time

he arrived on the scene. The defendant was seated in the back of a patrol car. After advising him of his *Miranda* rights, the detective spoke with the defendant. The defendant told him primarily what he had told Corporal Smith. He further advised the detective that Ms. Spencer had not been out of the house for almost three weeks, since the December 28 incident. The defendant advised the detective that Ms. Spencer's bruises and abrasions were the result of being beaten up on the 28th by unknown persons, at an unknown location, and at an unknown time. Detective Trouard testified that he had the entire area canvased to see if he could establish whether Ms. Spencer had been accosted by some men on that date. He said there was no evidence of such an attack. The detective received permission to search the house. On a walk-through, the detective noted an open bottle of bleach in the laundry room. He also noted the door frame to the defendant's and Ms. Spencer's bedroom was splintered away from the wall. The detective testified the only clean room in the house was the bathroom where Ms. Spencer reportedly slipped in the tub as she showered. The detective noted that while the bottom part of the tub was wet, the top part and the shower area were dry. The detective then went to the hospital and asked if he could see Ms. Spencer. He stated that he was shocked at the extent of her injuries. He said that he knew then there was a problem with this case. She had bruises from "head to toe." At this point, he requested that one of his detectives go to the hospital and photograph her injuries. He also requested that one of the detectives contact the bus line and get the video surveillance tape from the bus the day Ms. Spencer supposedly got into a fight with the bus driver.

The surveillance tape of the time Ms. Spencer got on the bus until she got off the bus was shown to the jury. The tape revealed a very thin young woman, dressed all in pink, getting onto the bus at a bus stop. She stood and spoke with the

6

bus driver for a few minutes without putting any money into the till. When the bus stopped and a passenger got off, Ms. Spencer yelled at the passenger to get back on. When the bus driver argued with Ms. Spencer and did not start driving, Ms. Spencer told her to keep driving. Through the front window of the bus, a Camaro can be seen driving towards the bus. Ms. Spencer became hostile and started hitting the bus driver. The Camaro stopped and backed up, and the defendant got out of the vehicle. By this time, a male bus passenger pulled Ms. Spencer off the driver and pushed her out the door to the defendant, who attempted to put Ms. Spencer into the car. The bus driver drove off with Ms. Spencer's purse still on the bus.

Carol Andrus was the bus driver involved in the December 28th incident with Ms. Spencer. She testified that Ms. Spencer got onto the bus when the bus stopped at a pick-up point. Ms. Spencer told the bus driver that someone had beaten her up and asked if the bus driver would help her. The driver said Ms. Spencer had a black eye and some scratches on her face. However, she did not see any other injuries as Ms. Spencer had on a pink shirt with long sleeves and long, pink pants. After Ms. Andrus started driving, Ms. Spencer became agitated and wanted her to drive in a different direction then what the bus route was. She also did not want Ms. Andrus to open the doors to allow passengers to exit the bus. Ms. Andrus stated that when she attempted to continue driving, Ms. Spencer started to hit her. One of the bus passengers pulled Ms. Spencer off the driver, took her off the bus, and gave her to a man who stopped his car in front of the bus. Ms. Andrus testified that she did not hit Ms. Spencer. While Ms. Andrus saw Ms. Spencer attempt to get back on, she drove away knowing that Ms. Spencer's purse was still on the bus. Ms. Andrus wanted to keep the purse so that her attacker could later be identified.

Dr. Foster Kordish was the emergency room physician the day Ms. Spencer was taken to the hospital. He testified she came in intubated and in critical condition. He ordered a CT scan. Doctor Kordish testified that according to the scan, Ms. Spencer had a bilateral subdural hematoma. He explained there were two areas on either side of the brain where blood had collected, putting a lot of pressure on the brain. Plus, her brain was swelling from the lack of oxygen. The doctor testified that there did not, however, appear to be any fracture of the skull. The scan also revealed that Ms. Spencer had five fractured ribs and both of her lungs were partially collapsed. Two of the rib fractures appeared to be new, or acute. He estimated the fractures were one to two days old. The remaining three fractures were sub-acute, or several days to a couple of weeks old. However, it was the brain injury that was the cause of death. The doctor testified that the extensive bruising on her body was caused by blunt force trauma. He further stated that while she could have vomited a few times, there was no evidence that she had not been eating or drinking for several days. She did not appear to be dehydrated. The doctor discussed the bruising, stating that it appeared some of the bruising was older and some much more recent. He opined the subdural hematoma was two to three days old. The doctor also was of the opinion that a fall in the shower was not the cause of the bilateral subdural hematoma. He stated that if a young person such as the victim faints in the shower, generally the person will simply collapse, and a subsequent blow to the head on the tub would not have been severe enough to cause a bilateral subdural hematoma. He stated with certainty the subdural hematoma did not occur nineteen days prior to Ms. Spencer's hospitalization.

Dr. Christopher Tape, a forensic pathologist, performed the autopsy on the victim and testified as to the results. Upon removing the skull and examining the

brain directly, Dr. Tape found a subdural hemorrhage that extended to both sides of brain. He stated that the blood was "loosely adherent," indicating that the injury was not very old. He further noted that when he pulled back the scalp from the skull, he found several hemorrhages, on the front and top of the skull area. He agreed that five ribs were fractured, two of which were relatively fresh fractures. The doctor described the contusion, abrasions, and bruising to Ms. Spencer's body. The injuries covered mostly her arms and legs and were very extensive. There were small, stab-like wounds to her arms, legs, and hands. There were contusions and bruises on her forehead, around her eyes, neck, shoulder, right breast, and lower abdomen. Furthermore, Dr. Tape agreed that the brain injury was most probably not the result of a fall in the shower. He explained that a number of things could cause this type of brain injury:

> [I]t has to be some sort of violent action, usually an acceleration or deceleration or multiple blows of some kind. . . . These are generally thought not to be from falls because when you have a fall, you have something called a 'coup countercoup injury.' When you fall, you'll have a mark wherever you hit on the external surface, but paradoxically, you might not expect the opposite side of the brain gets major injury. And it's the subarachnoid hemorrhage that happens. Subarachnoid just means it's within the brain parenchyma itself. It's within the brain tissue itself. And this is very different than this and it's very clear that you have the external coup injury and the internal countercoup injury, and that wasn't here in this case. So, I can say that there wasn't a major fall that caused the death here because there's no countercoup injury in the brain.

Dr. Tape testified that the cause of death was the traumatic brain injury, and considering the condition of the victim's body, he concluded the manner of death was homicide. He stated the brain injury was three to five days old, which included the one day the victim's body was on life support awaiting harvesting of her organs.

Rodney Joubert, a childhood friend of the defendant's, testified that of the three to four days prior to Ms. Spencer's death he spent in the defendant's house,

9

he never once saw her. In fact, he testified that he was not really aware of her existence. He did state that he might have heard them laughing once upstairs but agreed that it could have been the TV.

Finally, the defendant testified that he and Ms. Spencer had been dating for about eight months. She moved into his house after his mother died a few months before. He said when he left Ms. Spencer on December 28th, she was fine. But after the bus incident, when they got home, Ms. Spencer had bruises all over her body. She told him that she had gotten beat up by a couple of men while walking to the store. However, she would not tell him who, where, or when. He said he asked her every day if she wanted to go to the hospital, but she refused because she was concerned about an arrest warrant that had been issued after the situation with the bus driver. The defendant testified that for a few days before the slip in the tub, she had been complaining about a headache. She would not eat or drink anything. She was vomiting up everything she ate. That morning, he suggested she take a shower and try to get back into a routine. He was dressing in their room when he heard a crash. When he went into the bathroom, he found her face down in the tub. He said he attempted to pick her up out of the tub, but she slipped out of his hands, and he dropped her, and she hit her head on the side of the tub. He denied that he ever hit her at any time.

In brief, the defendant refers to *State v. Shapiro*, 431 So.2d 372 (La.1982), wherein the supreme court reversed a second degree murder conviction founded on circumstantial evidence because the state failed to exclude the reasonable hypothesis that the victim committed suicide. The defendant does not discuss *Shapiro* relative to the current case. However, in *Shapiro* the supreme court discussed at length the application of the circumstantial evidence rule, which may

10

be helpful in determining whether the conviction in the current case was based on sufficient, albeit, circumstantial evidence.

In *Shapiro*, the only eyewitness to the victim's death was the defendant, and he asserted that the victim killed herself, either accidentally or intentionally. Initially, the supreme court affirmed the conviction. The physical evidence, gun powder residue on the palm of the defendant's hand but a minuscule amount on the victim's hand, indicated that the defendant fired the gun. Moreover, the position of the body and the gun led to speculation by an expert that the victim could not have possibly shot herself. However, upon reexamination of the facts of the case, the supreme court noted that while the defense's and the state's experts were in disagreement, each of their opinions were also solely assumptions, probabilities, possibilities, and suggestions. The supreme court noted:

> [W]hile perhaps it might be concluded that the evidence does "tend" to prove that Shapiro fired the gun, the evidence similarly "tends" to prove that Ryland fired it. We therefore conclude that the state did not exclude the reasonable hypothesis that Lavonna D. Ryland's death resulted from a self-inflicted gunshot wound.
>
> The evidence in this circumstantial case is simply insufficient as a matter of law under La.R.S. 15:438. The defendant's conviction and sentence are reversed.

*Id.* at 388 (on rehearing).

The defendant offers two hypothesis of innocence in this case. Insisting that Ms. Spencer received the bruises, broken ribs, cuts, and contusions on December 28, the defendant contends that in all probability, Ms. Spencer caused her own head injury when she slipped or fainted in the shower and hit her head on the tub. He also suggested that Ms. Spencer had possibly gone out of the house on her own while he was gone from the house and was attacked by someone who caused the brain injury or that someone came into the house when he was not home and caused all the injuries, including the brain injury.

11

The defendant argues incorrectly that "[t]he two doctors that testified for the State disagreed amongst themselves as to whether a fall or falls in the shower could have caused the injuries to Ms. Spencer's brain in this case." Both doctors, however, agreed that it was highly unlikely that a fall in the shower was the cause of the subdural hemorrhage. They both explained that the subdural hemorrhage was not consistent with that type of fall. Both doctors agreed that the bleeding in the brain was extensive, extending from one side of the brain to the other side. They both agreed that one or more blows to the head could have caused the bleeding. Finally, both doctors testified that the brain injury was two to three days old from the date Ms. Spencer was admitted to the hospital.

In this case, the forensic evidence tended to disprove the defendant's assertion that, except for the brain injury, Ms. Spencer received all the injuries nineteen days before her death. The state's expert forensic pathologist, Dr. Tape, and the emergency room physician, Dr. Kordish, both agreed that several of the bruises, the broken ribs, and the contusions were no more than a few days to a week or more old, including the fatal brain injury.

The defendant further argues that the brain injury should have been considered separately when determining the manner of death. He argues that "Dr. Tape stated his reasoning was because **he considered all the injuries together**, instead of the possibility that at least the final injury was separate or occurred due to different reasons, like an accident." This statement might have merit had not both doctors testified that the infliction of the injuries was progressive. Both doctors testified that while many of the injuries were older, several were fairly recent. The rib fractures were from two or three days to a few weeks old. The bruising was in various stages of healing. The cuts and scratches on her arms and hands were beginning to scab over, but still open wounds. Dr. Tape testified:

12

Because there are so many injuries that I don't have a better explanation for them. An autopsy is diagnosis exclusion. We go down the line and there's all these injuries. There doesn't seem to be an accidental explanation for them. They don't seem to be as old as this three week explanation. The subdural hemorrhage - - assuming that is old as three weeks. There's multiple scalp hemorrhages, so therefore, I have to think that there was likely an assault, more likely an assault than anything else.

The defendant suggested at trial that, excluding the brain injury, all the injuries resulted from a beating Ms. Spencer took on December 28, 2012. He pointed out that Ms. Spencer told the bus driver that she had been beaten and asked for help. He testified that she told him she was walking to the store and was beaten up by some men for some reason. However, testimony established that she got onto the bus at the stop by her house. In brief, the defendant suggests that because she had been beaten up by two men, she got onto the bus in an effort to find him. However, considering the extent of the injuries, it seems unlikely that if Ms. Spencer had been beaten up as she walked to the store, instead of getting help right then, she went home and then decided to get on a bus to look for the defendant. In addition, the state established the extensive injuries were not nineteen days old.

The defendant initially indicated to Detective Trouard that following the incident on the bus, Ms. Spencer did not leave the house. Considering the fact that testimony established the infliction of the injuries was on-going, it was reasonable that the jury concluded it was the defendant who was beating her. The defendant testified that on the morning of the bus incident, Ms. Spencer was okay, but later that day she appeared with injuries which she said she got when some unknown person beat her up. The bus driver testified that when Ms. Spencer got on the bus, she had a black eye and a cut to her face. This was nineteen days before her death. The emergency room doctor and the pathologist who did the autopsy each testified that her injuries were from a few days old to a few weeks old. Accordingly,

approximately four or five days following the bus incident, Ms. Spencer received more injuries. Then approximately ten or twelve days after the bus incident, she received more injuries. Finally, a few days before she collapsed, she received at least the fatal injury, the injury to her brain. There were other inferences tending to disprove the defendant's hypothesis: the fractured bedroom door frame, the half-wet shower, and the victim who reportedly collapsed in the shower while wearing a shirt. The firefighter who first attended Ms. Spencer did not remember if her shirt was wet. Furthermore, there was evidence of a clean-up in the bedroom and bathroom with bleach. All the inferences which may reasonably be drawn from the facts were consistent with the defendant's guilt, and inconsistent with the defendant's assertion that the injuries were received on the day of the bus incident, and then, nineteen days later, she slipped in the tub and hit her head.

The defendant also suggested the possibility that while he was out of the house, she left the house and was assaulted again. As noted at trial, there was testimony that the defendant initially told the police Ms. Spencer had been continuously in his presence since the bus incident. The defendant, however, testified that he left the house for periods of time during the nineteen days since the bus incident. He argues in brief that "[t]he State could not rule out the possibility what while home alone, Ms. Spencer left the house and suffered any of the non-fatal or fatal injuries documented in this case[.]" This explanation was not a reasonable hypothesis of innocence. The defendant claimed that Ms. Spencer had headaches and was vomiting. This contention is contrary to his assertion that she could have left the home, sustained further injuries, and then failed to report that beating. She did not even venture downstairs to greet the defendant's childhood buddy, who was there for three or four days before she collapsed, and whom she had never met.

As noted above, the evidence must have a legitimate tendency to compel belief in and finding of the defendant's guilt. The evidence in this case was of such a character and tendency as to produce a proof of the defendant's guilt to the exclusion of reasonable doubt. Based on the apparent timeline of the injuries, the jury could have reasonably concluded the only logical explanation was that the defendant was systematically beating Ms. Spencer, which resulted in her death. Quoting *State v. Captville*, 448 So.2d 676, 680 (La.1984), this court in *State v. Jackson*, 14-9, p. 4 (La.App. 3 Cir. 6/18/14), 146 So.3d 631, 634-35, *writ denied*, 14-1544 (La. 2/27/15), 159 So.3d 1066, noted that in case of circumstantial evidence, "the fundamental principle of review means that when a jury 'reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt.'" As already noted, the hypotheses offered by the defendant were implausible in light of the medical testimony.

Specific intent is a state of mind and as such, it need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant. *State v. Williams*, 383 So.2d 369 (La.1980), *cert. denied,* 449 U.S. 1103, 101 S.Ct. 899 (1981); see *also* La.R.S. 14:10(1). Further, the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. *State v. Keating*, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, *writ denied*, 00-3150 (La. 10/12/01), 799 So.2d 494. The circumstances indicated beyond a reasonable doubt that the defendant intentionally inflicted serious bodily harm on Ms. Spencer and that she died as a result.

There is no merit to either the attorney-filed or the pro se assignments of error number one.

## PRO SE ASSIGNMENT OF ERROR NUMBER TWO

15

The defendant asserts that defense counsel should have objected to Detective Broussard's testimony regarding the use of the Blue Star reagent to locate blood in the bathroom and the bedroom. He argues that the jury was allowed to hear testimony which prejudiced him by inferring that he cleaned up a crime scene, thereby hurting his chances of a not guilty verdict. Accordingly, defense counsel rendered ineffective assistance.

The right of a defendant in a criminal proceeding to the effective assistance of counsel is mandated by the Sixth Amendment to the U.S. Constitution. *State v. Egan,* 44,879 (La.App.2d Cir.12/9/09), 26 So.3d 938; *State v. Wry,* 591 So.2d 774 (La.App. 2d Cir.1991). A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

To establish that his attorney was ineffective, the defendant first must show that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. The relevant inquiry is whether counsel's representation fell below the standard of reasonableness and competency as required by prevailing professional standards demanded for attorneys in criminal cases. *See Strickland, supra.* The assessment of an attorney's performance requires his conduct to be evaluated from counsel's perspective at the time of the occurrence. A reviewing court must give great deference to trial counsel's judgment, tactical decisions and trial strategy, strongly presuming he has exercised reasonable professional judgment. *State v. Grant,* 41,745 (La.App.2d Cir. 4/4/07) 954 So.2d 823, *writ denied,* 2007-1193 (La.12/7/07), 969 So.2d 629; *State v. Moore,* 575 So.2d 928 (La.App. 2d Cir.1991).

Second, the defendant must show that counsel's deficient performance prejudiced his defense. This element requires a showing that the errors were so serious as to deprive the defendant of a fair trial, i.e., a trial whose result is reliable. *Strickland, supra.* The defendant must prove actual prejudice before relief will be granted. It is not sufficient for the defendant to show the error had some conceivable effect on the outcome of the proceedings. Rather, he must show that, but for counsel's unprofessional errors, there is a reasonable probability the outcome of the trial would have been different. *Strickland, supra; State v. Grant, supra.*

As a general rule, a claim of ineffective assistance of counsel is more properly raised in an application for post-conviction relief ("PCR") in the trial court than by appeal. This is because PCR creates

16

the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. *State v. Hampton,* 98-0331 (La.4/23/99), 750 So.2d 867, *cert. denied*, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999); *State v. Ellis*, 42,520 (La.App.2d Cir.9/26/07), 966 So.2d 139, *writ denied,* 2007-2190 (La.4/4/08), 978 So.2d 325. When the record is sufficient, this issue may be resolved on direct appeal in the interest of judicial economy. *State v. Egan, supra.* Because the record is sufficient to adequately resolve the issue of the effectiveness of the defendant's counsel, and in the interest of judicial economy, we will address this defendant's claims on appeal.

*State v. Moran*, 47,804, pp. 9-10 (La.App. 2 Cir. 4/10/13) 135 So.3d 677, 683-84, *writ denied,* 13-1052 (La. 11/15/13), 125 So.3d 1101.

In the current case, a review of the trial record shows that regarding this particular allegation, the record is sufficient to address the issue of ineffective assistance.

At trial, following the state's direct examination of Detective Broussard, wherein he testified the Blue Star reagent could detect blood that has been cleaned up and that he sent swabs of the area where he found presumptive blood off for analysis, defense counsel questioned him regarding the alleged blood located in the bedroom and bathroom:

> Q. Okay. Now, I've got some things I'm real curious about. On two occasions in your testimony, you refer to it as possible blood. You said it shows possible blood.
>
> A. Yes, both testing procedures, the Blue Star [and] indicating sticks are both presumptive testing for blood. That's what they are, they're for presumptive test of blood.
>
> Q. Okay. And let me just suppose because I have the report from the Acadiana Crime Lab, and the Acadiana Crime Lab - - well, you swabbed it and sent it to them, didn't you?
>
> A. Yes.
>
> Q. And suppose because I have the report, Acadiana Crime Lab said there was no blood –

At this point, the state objected, arguing that the defense was questioning the detective about "something that's not in evidence." The defense pointed out that

17

the state had subpoenaed the crime lab records. However, apparently the state decided not to use the report issued by the crime lab. Defense counsel then requested the trial court to issue an instanter subpoena for whoever issued the report. Accordingly, during the defendant's case, defense counsel examined Ms. Winnie Kurowski, an expert in biological fluids and DNA analysis for Acadiana Criminalistic Laboratory. Ms. Kurowski testified that there was no blood detected on the swabs that were sent to the laboratory for analysis.

It is obvious that rather than exclude the testimony, defense counsel decided it would be more effective to the defendant's plea of innocence to impeach the detective's testimony. Defense counsel's decision not to attempt to exclude the testimony was apparently trial strategy.

In *State v. Truehill*, 09-1546, p. 17 (La.App. 3 Cir. 6/2/10) 38 So.3d 1246, 1257-58, this court discussed ineffective assistance and trial strategy, as follows:

> Ineffective assistance of counsel does not exist unless there was a deficient performance by the attorney. [*State v.*] *James*, [95-962, p. 4 (La.App. 3 Cir. 2/14/96), ] 670 So.2d [461,] 465. An alleged error can be construed as trial strategy if there are differing views regarding the advisability of a tactic: This court has long agreed with our brethren of the fourth circuit in recognizing "that if an alleged error falls 'within the ambit of trial strategy' it doesn't 'establish ineffective assistance of counsel.' *State v. Bienemy*, 483 So.2d 1105 (La.App. 4 Cir.1986)." *State v. Sias,* 03-891, p. 6 (La.App. 3 Cir. 12/10/03), 861 So.2d 829, 834, *quoting State v. Schexnaider*, 03-144, p. 18 (La.App. 3 Cir. 6/4/03), 852 So.2d 450, 462. This court has repeatedly used this approach to trial strategy. *State v. F.B.A.*, 07-1526 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, *writ denied*, 08-1464 (La.3/27/09), 5 So.3d 138; *State v. Duplichan* , 06-852 (La.App. 3 Cir. 12/6/06), 945 So.2d 170, *writ denied,* 07-148 (La.9/28/07), 964 So.2d 351; *State v. Collins*, 04-1441 (La.App. 3 Cir. 3/2/05), 896 So.2d 1265, *writ denied*, 05-1334 (La.1/9/06), 918 So.2d 1040.

The Louisiana Supreme Court has directly addressed the issue of trial strategy when reviewing an ineffective assistance of counsel claims in *State v. Brooks,* 505 So.2d 714, 724 (La.1987) where it stated:

> While opinions may differ on the advisability of such a tactic, hindsight is not the proper perspective for judging the competence of counsel's trial decisions. Neither may an attorney's level of representation be determined by whether a particular strategy is successful. *Strickland v. Washington*, 466 U.S. 668[, 104 S.Ct. 2052] (1984).

The jury heard Detective Broussard's testimony. The detective repeatedly explained the supposed blood evidence located in the bathroom and the bedroom were presumptive. Defense counsel questioned the detective at length regarding the testing procedure, and defense counsel had the opportunity to put before the jury the fact that there was no blood evidence on the swabs sent to Acadiana Criminalistic Laboratory. The defendant has failed to show defective performance or that the case was prejudiced by the testimony.

The defendant's pro se assignment of error is without merit.

## CONCLUSION

The state proved that beyond a reasonable doubt the defendant committed second degree murder of Gabriella Spencer, to the exclusion of any reasonable hypothesis of innocence. The defendant's conviction is affirmed.

**AFFIRMED.**